The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Thomas M. Harris presiding. Good morning. This is case number 4-24-0646, People v. Alexander Thomas Seymour. Counsel for the parties, if you could identify yourselves. First for the appellant. I'm Daniel O'Brien with the Office of the State Appellate Defender for Alexander Seymour. Thank you. And for the appellate? Christina Jackson, representing the people of the State of Illinois. Thank you. Mr. O'Brien, you may proceed with your argument. Thank you. May it please the court, counsel, again, I'm Dan O'Brien with the State Appellate Defender's Office, representing the appellant, Alexander Seymour. This is a simple case. There's only one question before this court today, and it's whether the evidence is closely balanced. The trial court committed a clear and obvious error when it failed to comply with Rule 431, and the state appropriately conceded that issue. Thus, I don't plan to address it directly. If the court has any questions, I'm certainly willing to answer them. But otherwise, the only thing I have to say on that is that this court should accept the state's concession. Because the issue wasn't preserved, the court has to find first-pronged plain error before it reaches the issue. With the Rule 431 violation, if the evidence is closely balanced, prejudice is assumed, or rather, the error is considered to be actually prejudicial, and reversal is required. Thus, the only question is whether the evidence is closely balanced. That question requires a common-sense assessment of the evidence within the context of the case. When a fact finder is presented with multiple plausible accounts, neither of which is corroborated by external evidence, the case is a credibility contest, and then closely balanced. That's precisely what this case presents. Good morning, counsel. I have a question with respect to the position that the appellant has taken. You rely on Naylor to support your argument. In Naylor, however, we've got the police officer's testimony, and we've got the defendant's version of what happened. And the trial court there found that both sides really had credible witnesses, and there was no extrinsic evidence or testimony to consider, and found, therefore, the evidence was closely balanced. But here, we do have extrinsic evidence, do we not? That corroborates the victim's version. We've got photos. We've got physical marks on the victim. We've got the police officer's testimony with respect to his observations. So, how is this case like Naylor? It's not, is it? I mean, the evidence here isn't closely balanced. So, with respect to the pictures, my point about the pictures is that they do not specifically corroborate the state's account. The pictures are consistent with either account. If it was the case that Alexander denied that anything happened here, the picture showing some kind of marks on Paula would corroborate the state's account. But that's not what we have here. What we have is two different accounts of how this physical altercation occurred. So, whether the pictures corroborate one version or another falls to whether sort of which version they match up closer to. So, the mere fact that there are pictures showing some kind of markings on Paula does not inherently corroborate the state's case. And again, the police officer adds little or nothing to it to corroborate that account either. Sir, I apologize. I have missed the point that you were making with the photos. Would you mind repeating it, please? Or saying it in a different way? Sure. There's no question that there was some sort of physical altercation here. Right. The pictures confirm that, but that's consistent with both accounts. There are very different accounts of what happened there. And so, the significance of the pictures lies in just which account they more closely match up with. And my argument would be that, given Alexander's explanation of the struggle and Paula's explanation of the struggle, the pictures are more consistent with Alexander's version. Again, we have more than the pictures. I mean, we have the police officer's testimony here regarding the marks that he saw. Right. And again, but that's all part of the same thing. I don't think that that in any way ‑‑ there's nothing about what the police officer added, which is very little, that corroborates Paula's account as opposed to Alexander's account. In Alexander's account, again, there is some kind of struggle. It wouldn't be unexpected that there would be some kind of markings on Paula in the area of her neck, mouth, et cetera. Based on Paula's account, one might very well expect there to be far more significant markings. Paula, for example, talks about being punched repeatedly in the face and mouth with force. But she doesn't even suggest that the cuts on her lip came from that. Her account of how the cuts might have come to her lip is actually very similar to Alexander's account. Alexander says, among other things, maybe that happened when she tried to bite me and I yanked my arm away. She says, here I have it here, what she says exactly. Here we go. Paula says, Paula's testimony was that the cuts were either caused by the right arm getting into place underneath my jaw or his left hand covering my face, my mouth, and my nose. Mr. O'Brien, how would defendant's account be consistent with markings on the victim's neck, on both sides of the neck? How is that explained? Because Paula, again, acknowledged that she pulled his arm up to her, tried to bite it. He yanked it away. So there's some kind of struggle there, which involves his arm coming up to her face. And again, the markings are not significant. They don't seem to line up very powerfully with the idea that she was forcefully strangled for three to four minutes. But Mr. O'Brien, taking what you say at face value there, let's say that him having his arm up towards the gear shift and her grabbing it or biting it, whatever, possibly explaining markings on one side of her neck. How do you get on the opposite side of the neck then? If his arm had been pulled completely across her face, it would have gone across her entire neck. Encircling her neck. I don't believe that the marks necessarily show that her neck is encircled. On both sides, the right and the left. Is that accurate? I think that there are very light markings on both sides. But again, I don't think anything that necessarily suggests strangulation. And what you described is how you believe the defendant's actions may have caused the markings that appear in the photos on victim's neck. Yes. Okay, thank you. Mr. O'Brien, good morning. The state describes your client's testimony or version of events, not testimony, as self-serving unsworn testimony in police recordings. He obviously didn't testify. When we're determining whether this evidence is closely balanced, should we in any way consider that this is unsworn testimony from your client's versions of events? Or how should we evaluate it? I don't think so. I think, first of all, this is evidence that was presented by the state. The state wants you to hear it. There's nothing in Naylor Sebi to suggest that what we're looking for here is two different accounts of what happened. Two different plausible accounts of what happened. There's nothing to suggest that this has to be sworn testimony. The fact that the defendant's comments are self-serving is somewhat inherent in the defendant making any comments. Otherwise, it would be unlikely that there would be a trial if his comments did not favor him. And again, the important thing is that two plausible versions get a count, not that one of them was introduced as sworn testimony. And I don't think that anything in Naylor, or anywhere else to my knowledge, suggests that the other account has to come in through sworn testimony. None of the cases say there aren't two plausible accounts here because there was no testimony on the defendant's behalf. Only because there weren't two versions heard by the fact finder. Thank you. Again, getting back to the pictures, the pictures show that there was some kind of physical altercation, but that was never in dispute. Alexander described a brief scuffle. The light redness and the marks to her lips are consistent with that. So, at best, this is something that is neutral for the state and arguably lines up more closely with Alexander's account than with Paula's. Can you just run through the facts of when the police attempted to contact the defendant and the defendant was in the basement? Just run us quickly through the facts. What was in evidence there? Yeah, that's another significant point because that's another piece of evidence that the state points to as being corroborative. The only evidence of this consciousness of guilt, the only evidence that Alexander was hiding, is the officer's characterization in his testimony that Alexander was hiding in the basement. Alexander says he was sitting in the basement having a cigarette. So, the officer's characterization here is simply subjective. There are no facts offered to support it. At no point does the officer say, for example, Alexander was in a closet in the basement. He was behind some furniture in the basement. Alexander didn't attempt to run. He didn't attempt to fight. There's no suggestion. There were other people there who could presumably have testified. But there's no suggestion that anybody was asked to hide Alexander, to conceal him, or to tell the police that he wasn't there. Mr. O'Brien, could you just identify what the sequence was, just briefly? How is it that they came to talk with the defendant? And what was the defendant's response when an attempt was made to identify him? Well, one of the officers says specifically, as another officer approaches when they're outside, this is at the 12-13 mark, I think. He seems to be explaining exactly how it is that he came to have Alexander in custody. And he says, quote, I just literally told him to get his ass up here. So, again, in terms of whether he was hiding in the basement or he was just in the basement, that seems to suggest the latter. The officer who testified in court agreed with defense counsel that Alexander, quote, just came out and willingly answered questions. During the back and forth with Alexander and the officers about that, there's some indication that an officer went downstairs, possibly that Alexander and another person were down there, and the officer didn't see Alexander. The officer leapt to the assumption that Alexander was hiding. Alexander said, no, I was in that room, just sitting there. You just didn't come far enough. As he described, again, in his conversation with the police officers, he wasn't particularly anxious to talk to the police officers. He didn't initially volunteer himself. But, again, at no point, even during their discussion with him, do they hint at anything that indicates that he was hiding from them. And the two times that it's mentioned how they did come into contact with him, it said that they just literally told him to come talk to them, and he did. He willingly answered questions. He also, in his explanation that he was sitting down there having a cigarette, the officers don't question that. So he was apparently sitting in a room with somebody else, based on, again, the nature of the conversation, smoking a cigarette, which strongly doesn't suggest that he was trying to conceal his whereabouts. If he was hiding from the police, again, he wouldn't be sitting out smoking a cigarette, which is pretty easily detectable. And, again, when they get him outside, when they start asking him questions, he doesn't hesitate at all. He perfectly willingly answers all their questions. Mr. O'Brien, how do you balance? You said that he didn't present himself. He waited until the officers asked him to come to them. How do you balance that with him, his statement that he tried to make a 911 call earlier in the morning and wanted to talk to the police? Right. I think that we're talking about two separate matters here. What happened on the way over there is definitely confusing, among other things, but apparently Alexander was worried that something unusual was going on. They weren't going in the right direction. He thought something else was happening, but they did end up where he thought he was going to go. So by the time they get there, anything that had prompted him to call the police earlier, for the most part, would have been dissipated at that point or really pretty much eliminated. Again, his concern was, it was phrased, something to the effect that he was being taken in a route that caused him to believe that he was being essentially abducted. So, again, I think at this point in time, whatever need that was had passed. One other point regarding the state, they also suggest that Alexander's account is implausible. But the only thing that they suggest is implausible or fanciful is Alexander's supposed story about how Paula got the injury. But as we've already discussed, well, we've already discussed it briefly, but first of all, Alexander didn't say that Paula deliberately caused injuries to herself, nor did he tell a story about what happened. He was asked by the officer what happened. He shook his head repeatedly, indicating that he didn't know, while offering three different possible accounts of how Paula's lip might have been injured. One of which, again, as I discussed earlier, lined up very smoothly with Paula's account of how she might have received the injury to her lip. So, although he didn't testify, he wasn't required to. He doesn't have to present any evidence in order for the evidence to be closely balanced. The rationale of Naylor applies here just as if he did testify. The fact finder was presented with two different plausible accounts. The minimal amount of additional evidence did little or nothing to corroborate the state's version, and if anything, it tended to favor Alexander's account. Either way, as the court said in Naylor, credibility was the only basis upon which defendant's innocence or guilt could be decided. Thus, the evidence was closely balanced. This court should reach the trial court's clear and obvious error under the plain-error doctrine, reverse Alexander's conviction, and remand for a new trial. All right. Thank you, Mr. O'Brien. You'll have time in rebuttal. Ms. Jackson, you may proceed with your argument. Good morning, Your Honors. Good morning, Counsel. Again, Christina Jackson, representing the people of the state of Illinois. May it please the court. The record does not indicate that one juror was asked specifically and responded regarding his error principles. Defendant did not preserve this issue. The people agree. It only raises it under the first-pronged plain-error analysis, claiming this is a credibility contest. Now, to establish first-pronged plain-error, it's defendant's burden to prove both that the error occurred and that it was so closely balanced that this error alone is what tips the scales. He fails to meet that burden for several reasons. First, because there are simply not two competing versions before this court. Since defendant's statement is not sworn testimony, it should not be weighed equally to that of the sworn testimony of the victim. But you concede it should be considered. Is that correct? What authority is there that says that it should not be considered? Well, defendant cites to no authority. It's defendant's burden in this case to prove that it is credibility. And he cites to no authority where a defendant's unsworn statements rose to the level of being a credibility contest in a first-pronged plain-error analysis. Well, so is it your position that that should not be considered? Correct. And what authority are you relying on? Simply based on per the Supreme Court's holding in Williams, in this court's decision in Rahamut, and in Mandrell merely two weeks ago, where a court on appeal conducts a common-sense qualitative analysis of the evidence presented at trial, and when it's absent defendant's testimony or any other evidence to support his position, the court is left with the victim's testimony, which was corroborated by other evidence. That's exactly what happened in this case. In what case? I'm sorry. You said there's a case that came out two weeks ago. What is that case? Mandrell. People v. Mandrell. And what is the citation? Please. If you don't have it readily available, we certainly can get it at the end. I do have it. Would you like it? It's People v. Mandrell, 2025. 231001-U. Thank you. Well, I guess I would ask as a follow-up, how do you respond to opposing counsel's position and argument that either there wasn't extrinsic evidence or whatever extrinsic evidence there was actually corroborated the defendant's account here? I would argue that there is extrinsic evidence, as we have both the testimony of Officer Vasquez, who personally observed her injuries, which corroborated her version of events, and also the photographs of her injuries as well. Now, defendant's argument is that they provide little corroboration, but little corroboration is still corroboration. And again, in every case cited by both the people and defendant, if the victim's testimony was corroborated to any extent, it was considered corroboration and removed it from closely balanced. Mr. O'Brien is saying that the photographic evidence, whatever the testimony of the officer regarding the markings was, is equally consistent with defendant's version of the events as opposed to the victim's version of the events. How do you respond? The people argue it's absolutely not consistent with his version because he simply doesn't offer any explanation at any point to the police officers how she sustained injuries under her chin, all across her neck, across her chest, and on her right shoulder. And another injury that we haven't discussed yet today is she also had bruising on her left forearm. That's never accounted for by defendant as well. So he's not offered, there's no contest of credibility there where he's not even offering an explanation or a version that can explain those injuries. For the victim's testimony, every part of her testimony where she's explaining the attack, those injuries exactly match her testimony. Well, in his opening argument, Mr. O'Brien was asked that question and he described how the defendant's account would result in the markings that were shown in the photos. Now, I don't think the bruising that you mentioned or the markings on her left arm were discussed, but otherwise he described those. So how is he wrong? Well, defendant's version to the police is that he never strangled her, he didn't hurt her. He doesn't say what he did or didn't do to her other than, oh, she got her bloody lip when she attempted to bite me. And both the victim's version and defendant's, she never even successfully bit him. So it's completely implausible. Even the one injury he has an explanation for, that she has this bruised, swollen, cut up lips and gums when her mouth in both the victim and defendant's version never even made contact with the skin in her bite attempt. Thank you. So as I stated, you have, if we're not considering his sworn testimony as a competing version, it's still not closely balanced in that defendant's statements and actions when the police arrived completely destroyed his credibility, making this not a credibility contest as well. The victim's testimony, again, as I stated, was corroborated by the testimony of Officer Vasquez. He's an independent third party. He has no skin in the game. I apologize. He has no skin in the game. And he observed immediately after the attack, with his own eyes, the victims of the injury. And they were all consistent with the victim's statements via sworn testimony. And again, those photographs as well depicted that. Now, per Lester, a defendant is bound to tell a reasonable story or be judged by its improbabilities and inconsistencies. And the defendant's conduct when the police arrived and his conflicting statements completely destroyed all of his credibility. So when they arrived, they had to search for him in someone else's home and found him hiding in the basement in the dark. Now, in both Effinger and Ola, the court held that a defendant's reaction when confronted in part corroborated the victim's assertions and also diminished defendant's credibility. That's precisely what happened in this case. Well, opposing counsel indicated that defendant's behavior certainly didn't indicate he was hiding, that he came upstairs, he was smoking a cigarette when he was downstairs. So how is that consistent with hiding? Well, he offers when the police are asking him about why he's hiding, he actually offered three different explanations as to why he didn't appear when they were searching for him within the home. First, he told them, I didn't know what was happening. And then second, when they're saying to him, there's police in the house, they hear you calling your name, what do you mean you don't know what's happening? He said, oh, well, he said to the officer, I was just sitting there. If you would have walked a foot forward, you would have seen me sitting there. So defendant intentionally was not revealing himself knowing that the police are searching for him. That's the definition of hiding. That's not the police's characterization of what the defendant was doing. He was clearly hiding. He's intentionally not revealing himself. But then later, when he's pressed on it again by the officer, he asserted, oh, well, I didn't come out because I suffer from PTSD. So on one hand, he's saying during the drive, he called 9-1-1 because he's concerned about being hijacked by his mother. But then when police arrive on the scene at the house, he's not coming out. He says it's because he's suffering from PTSD. So, you know, this isn't a matter of confusion. The defendant argued previously that, you know, it certainly is a confusing situation. These evolving and conflicting explanations were just that, they were conflicting statements. And they not only showed his consciousness of guilt, but also severely destroyed his credibility. And with regard to his explanations to the police officers, they were either completely implausible or they didn't account for the injuries altogether. And therefore, not a competing version of the victim's testimony. So he did deny strangling the victim, but the injuries all over her upper body completely contradict that. And the only injury, as discussed earlier, that he offers an explanation for is her bloody lip. And he only gave it because the officer pressed him on it. And he offered three different reasons of how she could have sustained it. Now, on appeal, he's saying that it's merely speculation. But he claims she could have got it from hitting herself, hitting herself on the steering wheel, or when she tried to bite him. So in Seve's analysis, part of what made that a credibility contest was we had two parties whose sworn testimony the Supreme Court referred to as neither offered a fanciful version. So in this case, both the victim and defendant, as I discussed earlier, both stated that victim attempted but unsuccessfully bit him. So it's completely implausible that she could have sustained the swollen, caught up bloody lips and gums when her mouth didn't even apply pressure to his skin via his version. Also, given the fact that the defendant or, excuse me, victim was recovering from shoulder surgery, she had several other injuries unaccounted for on her upper body and on her forearm. The people categorized defendant's explanation of upper lip as fanciful, to say the least. But I think it's more important to consider what defendant doesn't say. So defendant argues today and in his brief that he accounts for that the injuries account for both versions. But defendant's statements never address any other injury. He never offers an explanation or a version that explains how she would have sustained those. Again, she has markings under the chin, across her neck, across her chest, her right shoulder, bruising on the forearm. This cannot be a credibility contest when the explanation of one injury is completely implausible and there's absolutely no explanation to the version or, excuse me, or version that accounts for these other injuries. So also under plain error, defendant has to prove not only that this is so close, but also that this error alone is the grain of rice that tips the scale against him. So as stated, the record does indicate one juror was not specifically asked or responded regarding his error principles. She was admonished two times on those principles and the jury is presumed to have followed them properly. But defendant fails to meet his burden in proving how that error alone is changing the entire outcome of his trial. The jury deliberated for less than 45 minutes. The video never went back with them and they never even asked to view it. So it's obviously also not so closely balanced because defendant doesn't even raise an insufficiency claim on this appeal. And also he attempts to minimize the victim's injuries to make it closely balanced by claiming that they offer a little support. And as I've previously argued, little corroboration is still corroboration. And in every case cited by both defendant and the people, any corroboration of the victim's testimony, no matter how slight, removed it from being closely balanced. It's also further demonstrated by the fact that in defendant's reply brief, he had to reach so far to include the self-serving statement that was made by defendant in his PSI prior to sentencing where he accused the victim of false reporting. That was never argued at trial, was not considered by the jury, and should not be considered by this court. To reiterate, defendant fails to prove that this was a credibility contest for several reasons, but he also fails to prove how this error alone tipped the scales. And if your honors have no further questions, people ask this court to affirm defendant's convictions and sentence. Thank you. All right. Thank you, Ms. Jackson. Mr. O'Brien, rebuttal argument? Yes, thank you. A number of points I'll try to get to as quickly as possible here. First, the idea that there weren't two competing versions, again, there were. And so Williams, for example, distinguishes – I believe it's Williams. But as these cases distinguish each other, again, the thing that distinguishes them isn't that no evidence was presented, no testimony by the other side. It's that the jury or the fact finder didn't hear two different accounts. We have that here. That brings us to Mandrell, actually, the question or the case that the state added here that came out a couple weeks ago. In Mandrell, there aren't two different versions, so you don't have the explanation from the defendant about how this happened. In fact, there you had a video that showed what happened. So you had the officer's account of what happened, and then a video that the court felt showed that the officer's version was accurate, and they never heard any account from the defendant. So that is entirely different than the situation here. At times, I've used the phrase little or no corroboration. Again, I would reiterate that I believe that there is no corroboration. But even if there is a little corroboration, that doesn't remove it from being closely balanced. It removes it from being a credibility contest. A credibility contest is where there's two plausible accounts, neither of which is corroborated by extrinsic evidence. But even if one is corroborated by extrinsic evidence, that doesn't mean that it's not closely balanced. And again, the cases say this very clearly, that that doesn't end the inquiry. There being extrinsic evidence doesn't end the inquiry into whether it's closely balanced. Briefly on the question of the injury to the forearm, I think we're looking at a red herring here. There was no suggestion that she was punched or grabbed in the arm in any account. There's no indication she – well, she never complained of any injury there, never complained of any pain. Never – at the time, neither she nor the officer took any pictures of her forearm. This is just something that we have that she took later that she said, oh, yeah, and I have this, too. And again, even if that is a picture of something that occurred from that day, it's not something that Paula's account accounts for any more than Alexander's account. There was some kind of struggle when she's trying to bite his arm, et cetera. And that could be where that injury came from in either account. The fact that she didn't consummate the bite, well, I mean, that's really easily explained when you look at Alexander in the video. He's wearing this thick, rough coat. Frankly, she was never going to break any skin. It was a bit irrational in the first place to try to bite through this thick winter coat. So when you look at the coat, when you look at what they're describing, the fact that she might have gotten these injuries and even redness on her neck by trying to bite Alexander through that coat, that actually does make sense and that does line up. The officer's testimony, again, it's presented as if it's additional extrinsic evidence, but it's really just cumulative. The officer is just testifying. Again, we talked about the other aspect, the hiding thing, but really he's just testifying about the injuries that are in the picture. So it's not some additional source of information that sheds additional light on it. The officer's just confirming, yeah, there were injuries, as you can see in these pictures. So it's essentially just two ways of saying the same thing. As far as going back to the hiding question, I'm not sure. I don't want to swear to this, but I don't necessarily think that when he wasn't coming out that they were calling his name. In fact, as I said two different times, officers indicated that when they told him to come talk to them, he did. Finally, Alexander's, sorry, I see I'm out of time. So thank you. All right, counsel. Thank you.  Thank you both. The court will take the matter under advisement and will issue a written opinion. Thank you.